Case No. 22-7171, Estate of Yael Botvin v. Russell Ellis, Administrator, et al., Appellants v. Heideman, Nudelman & Kalik, P.C., et al. Mr. Tolchin for the Appellants, Mr. Waters for the Appellees. Mr. Tolchin, good morning. Good morning, Your Honor. Whenever you're ready. May it please the Court. I don't know if I'm going to be able to do such a fine job of captivating the Court for an hour and a half about mill, about mine milling sites, but I think that our case is a little more succinct. Look, it boils down to Judge Lamberth created a standard of foreseeability that did exactly what all the cases and all the versions of the restatement say not to do. That the foreseeability that we talk about with proximate cause is not that somebody did or should have been expected to predict exactly what course of events might transpire and foresee exactly the details of everything that might flow from any particular negligent action. The word foreseeability is a logical construct. That means one thing logically flows from the other and is not so very remote or diffusely related that it's not fair to link one to the other. It's a question of degree, right? I mean, you don't have to foresee the exact sequence of events that such and such assets would be located in such and such bank, which would lead to such and such settlement. But on the other hand, it's at some point, everything becomes foreseeable. If you just zoom out and say, if you're negligent, someone might hurt. Right? And I think how do we pick the right level of generality at which to assess? That's correct, your honor. And I think that the, what the terminology shift that the restatement 3rd employees referring to it as the arm within the risk. Look, if I failed to, if I'm a lawyer and I take a case and I failed to prosecute it diligently and I don't get a judgment timely, then when somebody claims that the damage suffered was, I wasn't able to enforce my judgment. That's that's the harm that's within the risk of not pursuing a case diligently. Now, if that plaintiff's brother in law comes along and says, if you had 1 case, then you would have been in a position to loan me money. And I wouldn't have lost my house to mortgage foreclosure and then we wouldn't have been living out in the street and I wouldn't gotten pneumonia. That's right. That's getting far afield. But all that we said in this case, can I ask you a question? Is it always the case? Is it always the case that getting the judgment sooner rather than later is going to be beneficial? What if, for example, there is a plaintiff who began the process of getting a judgment under the SIA 10 years ago? And in that plaintiff's case, maybe delay in getting the judgment would have helped them because it could put them within the window of being able to recover under the Peterson proceedings. No, I don't see how that could be around with the problem with the Peterson. I would just narrow this. It just seems to me that you're saying being able to get the judgment in time to capitalize on the Peterson proceedings, that was what should have been foreseeable. But it just seems to me that whenever you get your judgment, there'll be a different set of circumstances in play as to whether you can collect or not. And I'm just giving you an example of somebody who might have been benefited by a delay because that would put them within the window of Peterson. Peterson was a special event where all of a sudden there were assets before there were none. Peterson had a window that closed. If anyone who had a judgment prior to the close of that window, take a look at the Rubin plaintiffs were part of the original Camposano case, and they had their judgment back 10 years before Peterson. I don't think there's such a thing as being too early to an appointment. The problem is when you come too late. But what if you were early to the appointment and then you availed yourself of this fund, which precludes you from participating in Peterson? The fund did not exist. I'm just giving you a hypothetical. I mean, a lot of these things popped up. This is like a changing area of law. You avail yourself of something that precludes you from being in Peterson, then you would have benefited from getting your judgment later so that you would have participated. So I don't want to get too much into the weeds about Peterson and the fund, but to answer your specific question, Your Honor, because you've asked it, that fund, which was created in, I believe, December 2015, was created in a universe that knew about Peterson. And there was a choice to be made to either file. There were three ways you could file an application to the fund three ways. Well, actually, two ways you could forego filing for the fund and just get your money from Peterson, or you could file your application to the fund and forego Peterson. You actually didn't forego it. You assigned your Peterson benefits to the fund. Okay. Or you could do a conditional filing where you would wait to see which was going to be better. So just to complete my questioning. So what if there's suddenly a discovery of assets even bigger than a clear stream bucket of assets? What if there's one that's 10 times bigger that we learned about after Peterson-Windowson closed? Then it would have been to your client's advantage to not participate in Peterson. Maybe your client would have a bigger pro rata share of this new, bigger fund. People who got money from Peterson only satisfied a portion of their judgment. The unsatisfied portion of their judgment could be satisfied from other sources. But maybe they're entitled to a smaller pro rata share because they satisfied some of it. And your client will get a larger share of a larger fund. No, my client has a judgment that's a limited amount. And it may sound like a lot if it's 10 million or 30 million. Nobody's getting their full judgment. I'm just saying maybe your pro rata share of a later discovered large pile of assets is going to be bigger. But I won't care. That's just as foreseeable as Peterson was. Maybe something's coming. But that wouldn't be damaging to me. I would be very happy that I got 10% of my judgment satisfied by Peterson. And then I'll get 25% of my judgment satisfied by hypothetical sources of assets. But my hypothetical is because you didn't participate in Peterson, you've got a larger pro rata share of the bigger assets. So that advantages you. But all that matters to me is how much hard cash I get. Precisely. And is it foreseeable that some other funds out there that's going to give you a bigger share? It is foreseeable that there are other sources of Iranian assets out there. We know they're there. They're hidden. They're in shell companies. I mean, we know there's a there's a building called 650 Fifth Avenue, which has been in litigation up and down the federal court system for the last 20 years. And, you know, who knows what else lurks out there, whether it's in the United States or in another country or one day as part of some sort of rapprochement with Iran that might happen with another treaty like happened after the original Iran hostage crisis in the beginning of the Reagan administration. But all of all of these things are to participate in anything like that. One needs to have a judgment. And I can't escape the fact in my mind that these defendants were retained in February 2004. They served their complaint in June 05. They made their first motion for default, which was forgive me for being harsh, but inept in September 05. It was denied in June 06. They made another motion to take judicial notice of the Camposano case, but they did not submit damages evidence in October 06. And that was denied in September 07. But had they made the right motion in the first place, they would have had their judgment back in 2006 or 2007. And it would have been exactly the same time as they got their judgment. These same lawyers representing the plaintiffs in the Bland case filed the case in 2006. They got their judgment and they participated for the Bland plaintiffs in the Peterson case. It's purely the inept move after inept move. I have the feeling the case was assigned to an associate who didn't know what he was doing. It's just nobody was paying attention to this case. And it slipped through the cracks so many times. And the judgment was delayed by nine years till they finally got anywhere. And nothing was disclosed to these clients. And meanwhile, the notion that you need to move with alacrity to get a judgment so that you can have a seat at the table when there's any funds to recover was ignored. I don't think it's remotely not foreseeable. I mean, I'm a plaintiff's lawyer. I live and breathe every day the fear that I did not move quickly enough and my client is going to lose out. I stay up at night worrying that an insurance company might settle a case and the insurance company might go into liquidation and my client won't get his settlement. It's not unreasonable to think that if I don't get my judgment as quickly as I can, my client might lose out. And then to come now in retrospect, as my brother on the other side argues, that this was all a strategy. It's a strategy, a strategy to submit half-baked papers and not even take a swing when they pitch the ball. That's a strategy. And to say that that's a matter of law, not even a jury question, and it should be decided based on a lawyer's memo of law without even an affidavit from a client saying, yes, I did this on purpose. I'm trying to explain why. Can you address our case Seed v. Westerman? This is 961 F. 3rd 1190. It seems to be the most on-point case on foreseeability in the circuit. And in that case, an attorney gave his client bad information about the statute of limitations with respect to a legal claim against one person. And the client relied on that advice, missed out on a legal claim, not just against that person, but against another person that the attorney didn't know about. And we said that it wasn't foreseeable, that that would have happened. Your Honor, I do have to apologize. I don't have that decision with me, and I can't speak to the facts of it. See, I find that unusual because it seems to be the most on-point case. It's the D.C. Circuit opinion about foreseeability, and it's not discussed in your brief. In my brief, I was focused on the cases from the D.C. Court of Appeals. I understand that, but this is a legal malpractice claim. It's a D.C. Circuit case. Isn't that the most important piece of precedent to be citing to us? Well, it might be, and I apologize, but I don't have the case in front of me. Okay. Mr. Fulgen, I don't think you addressed anywhere thus far Judge Lambert's point at 25 in his opinion of 264 in the appendix. To the effect that it appears the Botvins could not have done any better, had they been included in the Peterson distribution, than they did by participating in the government fund. That is completely false. That is completely false. The amount of money that the Botvins got from the fund was substantially less than what they would have gotten from Peterson. And as I mentioned to Japan earlier, they did not need to make that choice. They could have submitted a conditional application to the fund and waited to see whether their award under the fund was larger than what they would have gotten from Peterson. And then they would have been able to have whichever was the best option. If the distribution was pro rata, why wasn't the judge correct in extrapolating from the Woltz family? Because the Woltz family was not a pro rata settlement of the – I know the Woltz case very well. The Woltz case was – the Woltzes got their judgment very late and came into the Peterson case not as ordinary participants who had judgments at the same time as the settlement agreement was being negotiated. They tried to barrel in the motion to intervene and set it aside and upset the apple cart. And the participants in the Peterson case agreed to pay them $1 million as a settlement. So you're saying that was not a pro rata distribution? That was absolutely not a pro rata. Absolutely not a pro rata. And so if Judge Lambert said it was, he's documentably wrong. I mean, I don't know that he said it, but that was implicit in his reasoning, of course. Yeah, no, it's absolutely wrong. Just – I mean, I represented the Rubens in the case, so I was on one side and I was previously counsel for the Woltzes, so I know the other side. That was not what happened. They got less than – they got a flat settlement of $1 million because they had a very weak case and they came in late in the game and they were not part of the pro rata distribution. And, yeah. Okay, Judge Pan, any other questions? No, thank you. Your Honor, I apologize about the Seed case. I'm wondering if I might be permitted to submit a 28-J letter just addressing that. Well, let's see. Are you able to look at it while we hear from your friend on the other side? Unfortunately, I'm not. I'm talking to you on my cell phone. I did not bring it. I expect it to be there in person. I think 28-J is limited to subsequent developments, not ones that went unnoticed. Well, that's why I asked. Well, if we want anything, we'll let you know. Okay. Okay. All right. We will – and we'll give you some rebuttal time. We'll hear from Mr. Waters now. Thank you, Your Honor. Good morning, and may it please the Court. For the appellees, Heideman, Neudelman, and Kalin, I'm Jason Waters. Your Honors, my clients handled the Botvin Foreign Sovereign Immunity Act case against Iran with diligence, skill, and care. They obtained a compensatory judgment in excess of $11.7 million, of which approximately $2.8 million has already been paid from the U.S. victim to state-sponsored tariff. The plaintiffs in this case have alleged that certain delays or actions that were taken during the underlying representation prevented them from participating in this unique, privately negotiated, one-of-a-kind, I believe first-of-its-kind sharing agreement among various judgment creditors against Iran. We believe Judge Lamberth correctly dismissed this case with prejudice, and we respectfully request the Court to affirm. We're on a motion to dismiss, so we have to assume factual allegations against you. In that posture, it seems like a big stretch to say there was no negligence, which I just heard you say. I mean, this case was filed in 2005, and the default judgment didn't happen until 2013. I mean, that's the easy part of cases like this. The hard part is enforcing. That's, what, an eight-year delay? Your Honor, I don't think it's a delay. I think that's the course of the litigation. It was a very complicated litigation. There were dramatic changes in the underlying legal landscape. And to be clear, Judge Lamberth's decision was actually quite specific with regard to the basis for granting our motion to dismiss, and it related to proximate causation. And granted, the Court may be a lot more sensitive about granting a motion to dismiss on proximate causation in a tort claim. But there are numerous examples we cited in our brief, including the lead case of Pietrangelo that Judge Lamberth relied on that dismissed on proximate causation grounds at the 12b6 level. In this particular circumstance, Your Honor, this is a very unique case with a very unique set of facts under a very unique statute. And the complaint details this history quite extensively. And the record of this litigation that's before the Court, properly before the Court on a 12b6 motion, all demonstrates exactly what Judge Lamberth found as a matter of law based on these pleadings. And the point is, I think he's really going towards, obviously he cites Pietrangelo, but also the well-established authority in Twombly and Iqbal with regard to the Court not being obligated to accept essentially speculative guesswork type of allegations. And this timeline is concrete with regard to certain aspects of this, and it establishes that the allegation in this complaint with regard to what the negligence was, even if you assume that it was negligence, which we don't concede, but even if you assume that it was negligence, the foreseeability of that negligence of having the consequence that is deleterious to the plaintiff's interests, right? Or having this particular consequence is so legally impossible that it does not state a claim, and because of the concretely established timeline, cannot state a claim. Do you agree just as a matter of but for cause, just assume that we think we have to accept negligence on a motion to dismiss. But for the assumed negligence, there would have been a judgment in time to allow this plaintiff to get into Peterson. Why is that not a plausible inference from the specific facts pleaded here? Because the standard for proximate causation in the District of Columbia in legal malpractice relates to decisions such as the Chase Company, the Seed Company case that Judge Pan referenced. With regard to the reasonable foreseeability of the type of… Okay, I'm just asking for now, I'm just asking about but for cause. You think we can't infer, make a plausible inference at the pleading stage on at least that much? I don't believe you can make that plausible inference in this particular circumstance because of the very detailed and complicated legal changing framework that was happening at this time. You lost a year just from the initial mistake of filing the notice of default with the court rather than the clerk. You took a year off this and they're within Peterson. I'm not saying they'll win on the merits, but at a motion to dismiss stage, you can't make a plausible inference that you pushed the clock back at least a year or two for all these mistakes. We're making a considerable assumption about the timeframe of the litigation and how quickly it would proceed. As Your Honor may be aware, and we demonstrated in our briefing with the appendix timeline, this case, my clients were actively representing these individuals in what we've called BOTFL1 for about seven and a half years. During that time, the case sent about five and a half years pending a decision on various applications for relief. So we're speculating, entirely speculating, and I think that was Judge Lambert's point about whether certain things could have proceeded differently or faster. I think what's also speculative is that an earlier judgment would have been a better judgment or at least equal to the judgment that was ultimately received. So I don't think that we can make that assumption that but for what Mr. Tolchin says is negligence, right? And we disagree, but for what he cites as being negligence necessarily would have resulted in an earlier judgment that would have put them into Peterson. I think the problem with this legally is that Mr. Tolchin's argument is looking at this entirely through the benefit of hindsight, right? We don't define legal malpractice that way. We don't look backwards from the harm and say each decision you made could have been different if you had done something differently. Fair enough. So let me just shift from but for to proximate the foreseeability issue. And why isn't it, as I suggested to your friend, this seems to me like a level of generality problem. Why isn't it good enough on the plaintiff friendly standard, which generally treats foreseeability as a question of fact? Why isn't it good enough just to think general foreseeability if you're suing a scofflaw defendant that's hiding assets all over the world, better to get the judgment sooner than later because who knows when you'll find something? Why isn't that specific enough? I have multiple responses to that, Judge, and bear with me, please. First, proximate cause must still be proximate. We can't look at it so broadly as to say that any potential factor or event is necessarily causally related because regardless of how distant or tenuous it is from the nexus between the event and what is cited as being the cause. In this case, even looking at this as broadly as we possibly can, we have to at least acknowledge this is a Foreign Sovereign Immunity Act case under the terrorism exception, and the defendant is Iran. Iran does not defend these cases. It certainly shows up when its assets are being challenged for potential seizure, but it does not defend these cases. And Judge Lamberth gave an incredibly expansive decision in 2009 in re-terrorism where he was talking about specifically the general foreseeability of collecting a judgment against Iran, and his statements were remarkable. He commented that the prospects of recovery were, quote, extremely rare, that enforcing judgments was all but impossible, that the judgments were largely enforceable, that this dynamic created a grave travesty, that collecting judgments against Iran were virtually impossible, and that the terrorism exception itself had become an empty promise. This is a really, really important thing to remember in the context of the change that was going on between 1605A7 and the Sisipio-Polio decision, and 1605A and the very, very significant change in public policy that that reflected because under 1605A7, the courts were required to consider choice of law issues, the existence and viability of causes of action under various states' law, but 1605A or Big A took that all away and changed this landscape in a way that the lawyers were trying to figure out how to address this in a way that was protective and defensive of our clients' interests. Judge Lamberth noted... Notwithstanding all the difficulties that Judge Lamberth had previously laid out, your client accepted this case on a contingent basis, and it looks like it invested a substantial amount of time and money out of pocket for experts, but more important, for all the time it took to litigate this, and so it must have been of the view that there was enough of a chance, ultimately, of recovering something to take this gamble, to invest these resources on the hope that something would turn up. And, of course, from time to time, some things do turn up, and under just knowing that and nothing more, it would seem that time is of the essence at every moment in this litigation and that the firm would be pursuing matters as expeditiously as possible. Fair enough? Judge, I don't necessarily agree with that statement, and part of the reason is because of the uniqueness of the FSIA litigation and that there are competing interests involved in this, particularly as it relates to the executive's interest with regard to foreign policy concerns or international relations concerns. That's what makes it so dicey. It makes it so unique, but the point is our courts are charged with ensuring rule of law and the adherence to statutory language and our constitutional principles, even for a belligerent, bellicose, non-appearing defendant such as Iran. So in these circumstances, Your Honor, I believe the court, I believe Judge Urbina's view of this during the litigation was better to get it right than necessarily to get it fast. And I think my clients handled this in a way that was conservative and appropriate and actually one of the approaches that was recognized in Judge Lambert's decision with regard to how you handle this transition to 1605 large A was that they did, in fact, pursue this as expeditiously as they could with the reasonable understanding with regard to their existing and foreseeable collection opportunities with respect to Iran. Now, of course, that has changed. As Judge Lambert said, you have to foresee that Iran secretly and surreptitiously and illegally was holding $2 billion of assets in the United States, which, by the way, that is minimal compared to the amount of judgments that existed at the time against Iran. And one of the important things that's really, really unique to this particular case is it's not just foreseeability that there's an opportunity to collect from Iran. It's that they would have an opportunity to collect from Iran in the sense that they would be able to participate in a privately negotiated settlement agreement with judgment creditors, with judgments that vastly exceeded the value of their own judgment and long preceded even their filing. You're taking Judge Lambert's level of generality here, which is none, making it very specific. And of course, people couldn't anticipate that. The whole point of the undertaking is something might turn up and you can't anticipate what it is or when it will be, only that something might turn up. That's all you can do. Isn't the foreseeability here, it would have to be not just that something would turn up, but that there would be a very limited window to collect against those assets. And that limited window was driven by this settlement agreement that these other plaintiffs reached, things that are unusual. I mean, if that was possible, assets turn up. But the fact that there was a really limited window in which you could participate in trying to attach them was driven by these other things that are more specific and strange. Again, I think we're speculating about the nature of the assets, the agreement of creditors with earlier priority, about whether those are actually collectible, whether there's a variety of different factors that we'd have to speculate about. And again, during the course of the litigation, this litigation, the understanding was there were billions of dollars of judgments against Iran and extraordinarily limited assets in which to collect. So our clients sought to maximize the judgment potential of this particular award, made certain decisions when Congress enacted the law that were reasonable under the circumstances to protect the client's best interest to maximize their judgment. Their judgment will be enforceable for many years and can be redomesticated. And I think one of the points that came out with Mr. Tolchin's argument, and I think one of your questions was, what's to say that there isn't another future asset that's going to be recoverable against which these clients could participate? What's to say that there won't be further distributions from the USVSST? All of this illustrates the speculative nature with regard to the collectability of a judgment against Iran under these circumstances. And I think going to Judge Katsas' points and Judge Ginsburg's point, I think Judge Lambert looked at this very, very specifically because, and I think for good reason. What is claimed here is a very, very particular and unique harm. They didn't claim general inability to collect from other sources. The particular claim here is the Peterson Sharing Agreement and their calculation of the pro-rata share of that. And even if you're looking at this even more broadly, just as an FSI claim against Iran, we believe that Judge Lambert's got the correct outcome and the dismissal was appropriate. I'm well over my time. Unless there are any other questions, I'd gladly conclude my argument and request you to go from. Judge Pena? Nothing. Judge Ginsburg? No, thank you. Okay, thank you, Mr. Waters. Mr. Tolchin? Thank you. I'll try to be quick. Of course, we, just to start from the end, of course, we alleged a particular claim. If we sue saying you committed malpractice because you didn't get a judgment from me, then the natural defense would be, well, it didn't matter that you didn't get a judgment because there were no assets out there. It's the very fact that there were assets out there that we missed out on that gives rise to the ability to bring the matter home. Next, the, nobody should lose sight of the fact that the, one of the participants in the Peterson matter was the plaintiffs in Bland who were represented by none other than our defendants. They knew about Bland. They knew about the prorating. They were part of the, they were part of that negotiated agreement and you can, you can bet your britches that if they had another client like the, the Botvinns, who also had a judgment, they could not possibly negotiate participation in Peterson for one client and not the other without being under a deafening conflict of interest. So if they had a judgment, they would have been in, or at least I believe there's a- Why is there a conflict of interest? Bland had a judgment earlier than, than the Botvinns. Bland only got their judgment earlier than the Botvinns because for some reason the, the Heidemann firm paid attention to it. The Bland case was not actually even filed until 2006. Our case was filed in 2005 and the Heidemanns were retained in 2004. Now, the Bland case had a lot more plaintiffs. So that propped to me, to my cynical way of viewing the world, that explains why they paid more attention to it. They made more money from it. But that doesn't mean that it's okay to take your clients to Botvinns. Mrs. Botvinn lost her 14-year-old daughter. It does not mean you can take your case, take their case, and not pay attention to it and let your other case that was started later get all the way to the end while you're still trying to get out of the starting gate on Botvinn. And the last thing I'll say, because I know my time is up or running out, is I managed to quickly, with a big disclaimer, take a look at Seed on my phone, which is hardly a proper way to do legal research. But I think, first of all, Seed, yes, it is a D.C. Circuit case, but it cites the Davell case. It cites the D.C. v Zuckerberg case, which were the D.C. Court of Appeals cases cited in my brief. And there's a big difference in Seed that there was a subsequent lawyer who came into the picture while there was still time to fix the problem. So that subsequent lawyer, I mean, let's say the Botvinns had changed counsel mid-representation, and while there was still time for the new counsel to fix things, that's what happened in Seed. That's different from our case. Okay, thank you. Judge Pan, anything else? No, thank you. Judge Ginsburg? No, thank you very much. Okay, thank you, Mr. Tolchin. The case is submitted.
judges: Katsas, Pan, Ginsburg